J-S24001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.T-F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3216 EDA 2019 |

Appeal from the Decree Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000174-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: O.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3217 EDA 2019 |

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002720-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.-C.M.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3218 EDA 2019 |

Appeal from the Decree Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-000075-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: J.C.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| MINOR | : | PENNSYLVANIA |

J-S24001-20

APPEAL OF: W.F., MOTHER                      :
                                             :
                                             :
                                             :
                                             :
                                             :
                                             :
                                             :    No. 3219 EDA 2019

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002062-2017

IN THE INTEREST OF: N.G.N.F., A    :    IN THE SUPERIOR COURT OF
MINOR                              :        PENNSYLVANIA
                                   :
                                   :
APPEAL OF: W.F., MOTHER            :
                                   :
                                   :
                                   :
                                   :
                                   :    No. 3220 EDA 2019

Appeal from the Decree Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000176-2019

IN THE INTEREST OF: A.F., A MINOR  :    IN THE SUPERIOR COURT OF
                                   :        PENNSYLVANIA
                                   :
APPEAL OF: W.F., MOTHER            :
                                   :
                                   :
                                   :
                                   :
                                   :    No. 3221 EDA 2019

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002063-2017

IN THE INTEREST OF: M.M.F., A      :    IN THE SUPERIOR COURT OF
MINOR                              :        PENNSYLVANIA
                                   :
                                   :
APPEAL OF: W.F., MOTHER            :
                                   :

- 2 -

|  | : |  |
|---|---|---|
|  | : |  |
|  | : | No. 3222 EDA 2019 |

Appeal from the Decree Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000177-2019

| IN THE INTEREST OF: M.M.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
|  | : |  |
|  | : |  |
| APPEAL OF: W.F., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 3223 EDA 2019 |

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002064-2017

| IN THE INTEREST OF: S.L.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
|  | : |  |
|  | : |  |
| APPEAL OF: W.F., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 3224 EDA 2019 |

Appeal from the Decree Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000178-2019

| IN THE INTEREST OF: S.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
|  | : |  |
| APPEAL OF: W.F., MOTHER | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | No. 3225 EDA 2019 |

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002721-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: M.G.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3226 EDA 2019 |

Appeal from the Decree Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000179-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: M.G.F., A MINOR     : | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3227 EDA 2019 |

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002065-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: H.-I.S.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3228 EDA 2019 |

Appeal from the Decree Entered October 9, 2019

In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000180-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: H.-I.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3229 EDA 2019 |

Appeal from the Order Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001920-2018

BEFORE: BENDER, P.J.E., STABILE, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED JUNE 26, 2020**

W.F. ("Mother") appeals from the orders and decrees entered on October 9, 2019, that granted the petitions filed by the Philadelphia Department of Human Services ("DHS") seeking the involuntary termination of Mother's parental rights to her seven children ("Children") and to change the permanency goals for the Children to adoption.[1] We affirm.

Initially, we note that the trial court provided an extensive thirty-seven page opinion, reviewing the factual and procedural history of this case. The

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] This Court consolidated these appeals by order dated December 31, 2019.

court also expansively discussed its reasoning for terminating Mother's parental rights for the seven Children and for changing their goals to adoption.[2] For this Court's review purposes, we set forth the Guardian *ad litem's* (GAL) statement of the case from the brief submitted to this Court in connection with this appeal.

On October 6, 2017, DHS received a Child Protective Services report, alleging that the youngest sibling of seven children ("Sibling"), a four-month-old child, died in the family's home and was transported to Children's Hospital of Philadelphia ("CHOP"). Sibling was pronounced dead upon arrival at CHOP. The autopsy revealed that Sibling had sustained a skull fracture. On October 10, 2017, DHS visited the family home and conducted interviews of all the family members. On October 11, 2017, DHS obtained Orders of Protective Custody ("OPC") for S.F., C.F., A.F., M.[M.]F., M.[G.]F., and O.F. ("Child 1" through "Child 6", or collectively, the "Children"), and the Children were subsequently placed in foster care. On October 23, 2017, a contested adjudicatory hearing was held for the Children. The temporary commitment to DHS was ordered to stand. The trial court ordered that the addresses of the Children's respective foster homes were to remain confidential, and that Mother could not have any contact with her [C]hildren at school as well.

At a single case planning meeting on November 10, 2017, the Children's primary goal was identified as reunification. In addition, Mother was ordered to (1) sign all necessary consents and releases of information; (2) participate in domestic violence services; (3) comply with behavioral health services and follow all treatment recommendations; (4) engage in parenting services; and (5) comply with Community Umbrella Agency ("CUA") and Turning Points for Children ("TPC") services. On November 20, 2017, a contested adjudicatory hearing was held for the Children, in which the [c]ourt deferred the adjudication, ordered the temporary commitment to DHS to stand pending further

_____

[2] None of the fathers of any of the Children were identified and none took part in this appeal.

- 6 -

investigation, and ordered Mother's visitation to remain suspended until the [C]hildren's therapists deemed visitation was appropriate. On December 21, 2017, DHS received a report from the Medical Examiner[']s Office of the City of Philadelphia, which found (1) that a blunt impact injury to the head was the cause of Sibling's death; and (2) it was determined to be a homicide.

On January 19, 2018, there were contested child abuse and adjudicatory hearings held for the Children, in which all six children were adjudicated dependent, and the court discharged the temporary DHS commitment and fully committed all six children to DHS. The trial court found that Mother was the perpetrator of child abuse pursuant to 23 Pa.C.S. §[]6303 because Sibling was the victim of homicide while in Mother's care, and held that aggravated circumstances existed pursuant to 42 Pa.C.S. §[]6302 because Sibling was the victim of physical abuse resulting in serious bodily harm while in Mother's care. Thus, the trial court found that no reasonable efforts were to be made to reunify the six children with Mother. On March 9, 2018, Mother was arrested and charged with 18 [Pa.C.S.] §[]2502 Murder in the First Degree[,] and 18 [Pa.C.S.] §[]4304 Endangering Welfare of Children-Parent Commits Offense. Since Mother's arrest, she has been incarcerated at Riverside Correctional Facility [("RCF")] in Philadelphia, Pennsylvania. Mother was pregnant at the time of her incarceration.

On April 12, 2018, a permanency review hearing was held for the Children, in which the court granted a continuance due to Mother's request for new counsel, and held that all prior orders stood. On August 7, 2018, H.-I.F. ("Child 7") was born healthy at Holy Redeemer Hospital with no medical concerns. On August 15, 2018, DHS received an OPC for Child 7 and subsequently placed her in foster care. On August 22, 2018, DHS filed a dependency petition for Child 7, and on August 28, 2017, she was adjudicated dependent and fully committed to the custody of DHS.

The Children have been in foster care since October 11, 2017, and Child 7 has been in foster care since August 15, 2018. Given the nature of the crime and the issues at hand, Mother was prohibited from having contact with Child 7.

Prior to her incarceration, Mother failed to comply with CUA and TPC services and court orders. Similarly, following her incarceration and during her incarceration, and despite the

availability of programs in jail, Mother remained minimally compliant.

On March 15, 2019, DHS filed petitions to terminate Mother's parental rights and change [C]hildren's permanency goal[s] to adoption. On July 12, 2019, the court began the termination and goal change trial, which was continued for further testimony to October 9, 2019. On October 9, 2019, after all testimony was given, the trial court found clear and convincing evidence to change the permanency goal to adoption and terminate Mother's parental rights pursuant to [23] Pa.C.S.[] §[]2511 (a)(1), (2), (5), (8), and (b).

Guardian *ad litem's* brief at 5-8 (citations to the trial court opinion omitted).

Mother appealed and now presents the following issue for our review:

Whether the [t]rial [c]ourt erred and/or abused its discretion in finding DHS met its burden by clear and convincing evidence that Mother's parental rights to her [C]hildren should be involuntarily terminated and the goal changed to adoption?

Mother's brief at 9.

We review an order terminating parental rights in accordance with the

following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879

A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

- 8 -

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear

and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***R.N.J.***, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. ***Id.*** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. ***Id.*** at 763.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), (8) and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> ***

- 10 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental

- 11 -

duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Relative to Section 2511(a)(2), Mother argues that the trial court focused its determination on her incapacity due to her incarceration. She asserts that other than her incarceration no evidence appears in the record that supports her incapacity. Although Mother acknowledges that her pre-trial incarceration inhibits her ability to parent her Children, she has not yet been tried and found guilty. Rather, she appears to claim that she will be found not guilty and be released. Mother further argues that prior to being incarcerated, she had appropriate housing for the Children and has no alcohol or substance abuse issues. Lastly, she contends that nothing in the record supports a finding that she would not have the capacity to aid the Children with their mental health needs.

The trial court addressed the facts it found relating to subsection 2511(a)(2), stating:

> Throughout the time that Children have been in DHS custody, Mother's original SCP [(Single Case Plan)] objectives from January 2018 were dual diagnosis assessment and treatment, random drug screens, comply with CUA services, attend the ARC [(Achieving Reunification Center)] for employment, job training, and housing, receive a consultation and/or evaluation from BHS [(Behavioral Health System)], and complete a PCE [(Parenting Capacity Evaluation)]. After Mother was incarcerated in March 2018, Mother's objective[s] were updated and she was to provide CUA with the protocols for any programs or treatment that she was receiving while incarcerated. Mother has been incarcerated at RCF since March 10, 2018, and has been awaiting trial for charges related to first degree murder and endangering the

welfare of children. Mother indicated that she has been sent a list of her SCP objectives from CUA, but claims that she was unaware that she needed to obtain employment, housing, or complete a PCE [(Parenting Capacity Evaluation)]. Mother has received a list of her SCP objectives and has attended hearings, so Mother has been aware of her objectives for the life of the case. Although Mother informed CUA that she completed a 90-day drug treatment program at RCF in April 2019, Mother has not provided documentation that she has completed a dual diagnosis drug and alcohol and mental health program. CUA did receive a letter approximately one week prior to the termination and goal change trial on July 12, 2019, indicating that Mother was participating in some type of mental health treatment, but CUA did not receive any progress reports or treatment plans regarding Mother's treatment. Mother claims that she is engaged in mental health treatment through RCF. Mother has indicated that she has been previously diagnosed with PTSD. Between January 2018 and March 2018, the time period prior to Mother's incarceration, Mother failed to make herself available to go to the CEU [(Clinical Evaluation Unit)] for any drug screens or for a dual diagnosis assessment. Prior to the time that Mother was incarcerated, although CUA made efforts to connect Mother with ARC for services, Mother's case was closed due to inactivity. Mother never began any of the courses from the referral to ARC, including the course for job training, employment, and housing. Prior to Mother's incarceration, Mother did have appropriate housing for Children, but Mother lost that housing after her incarceration. Since Mother has been incarcerated, CUA received certificates indicating that Mother completed a parenting program and that she participated in a mothering program where she provided breast milk to Child 7. Mother indicated that she is employed at RCF as a tutor for other inmates that are preparing for their GED. Mother did admit that while incarcerated at RCF, she lost her previous job with the Chaplain after receiving a "write up," and [h]as spent time in solitary confinement after Mother was discovered carrying contraband. Prior to Mother's incarceration, Mother never provided any documentation indicating that she was employed. Prior to Mother's incarceration, Mother never made an appointment at BHS for an assessment for either a consultation or evaluation. Additionally, Mother never contacted CUA to make arrangements for Mother to complete the PCE. Mother has been minimally compliant with her SCP objectives. Since Children entered DHS care in October 2017, Mother has not had any contact with Children. Mother's visitation with Children was

suspended at the shelter care hearing. At the permanency review hearing in October 2018, the trial court ordered that visitation only occur at the recommendation of Children's therapist[(s)]. Even if Mother were immediately released from RCF, CUA does not believe that Children can be safely returned to Mother's care due to Mother's failure to engage with her objectives prior to her incarceration. Additionally, there are still concerns regarding Mother's ability to provide safety for Children, even if Mother completed all of her objectives due to concerns regarding Mother's ability to properly engage in mental health treatment for herself and manag[e] Children's need for mental health treatment. On January 19, 2018, the trial court found that Child 1, Child 2, Child 3, Child 4, Child 5, and Child 6 were victims of child abuse, as perpetrated by Mother, and that aggravated circumstances existed. On August 28, 2018, the trial court found that Child 7 was the child of a parent who has been found to be the perpetrator of child abuse and that aggravated circumstances existed. The trial court found that no reasonable efforts were to be made to reunify Mother with Children. Children need permanency, which Mother cannot provide. Mother's incapacity existed prior to her incarceration and the conditions and causes of Mother's incapacity cannot or will not be remedied by Mother. Children have been adjudicated dependent since January 2018, and Children have been in DHS care since October 2017, twenty-one months at the time of the first part of the termination trial on July 12, 2019. Mother has been incarcerated since March 10, 2018 sixteen months at the time of the termination trial on July 12, 2019, as she awaits trial for first degree murder and endangering the welfare of children. Even if Mother were to be released from prison in the near future, CUA does not believe that Mother and Children could be immediately reunified. Children, except for Child 7 due to her tender age, have many specialized needs, in particular, the stabilization of their mental health and emotional needs. Children have received trauma-focused therapy at CCTC [Children's Crisis Treatment Center]. Child 1 has been diagnosed with PTSD. Child 2 and Child 4 have successfully completed their mental health therapy and have adjusted well to their foster family. Child 2 and Child 4 are also no longer truant and excel in school. Child 3 is currently hospitalized at Belmont Psychiatric Hospital in order to be stabilized and meet his emotional needs. Child 3 has struggled in previous placements due to his mental health needs. Child 5 has also struggled in numerous placements and requires a treatment-level placement. Child 5 has also been diagnosed with PTSD [and] is struggling with his "secret." Child

6 is struggling in his trauma-focused therapy sessions, regarding inconsistencies involving Sibling's death and separation from Mother now and in the recent past, while they lived in New York City. Child 6 has also been diagnosed with PTSD. Mother's current incarceration and outstanding SCP objectives remain a barrier to reunification and renders Mother unable to provide essential parental care, control, and subsistence necessary for Children's physical and mental well-being. The DHS witnesses were credible. Termination under 23 Pa.C.S.[] § 2511(a)(2) was proper.

Trial Court Opinion (TCO), 12/19/19, at 12-14 (citations to N.T. omitted).

Having reviewed the record, we conclude that it supports the findings of the trial court that Mother has not, and cannot, provide the Children with the essential parental care, control and subsistence necessary for their mental and physical well-being, and that Mother is unable to remedy the causes of her parental incapacity, neglect or refusal. While the trial court noted Mother's few positive accomplishments, it is clear that Mother will not, or cannot, become a capable parent for the Children at any point in the foreseeable future. Thus, we conclude that DHS has carried its burden of proving the statutory grounds for termination under subsection 2511(a)(2). Therefore, Mother is not entitled to relief.

Next, we consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed the required analysis under Section 2511(b) previously in this memorandum. *See In re Adoption of J.M.*, 991 A.2d at 324. Mother argues that despite the fact that it is DHS's burden to prove the effect of the

termination on the Children, the agency has not presented any testimony or evidence as to what the effect of the termination would have on each of the Children. Although Mother acknowledges that DHS provided evidence about the Children's mental health issues that they have suffered since Sibling's death and their removal from her care, she contends that no evidence was offered relating to their mental health prior to Sibling's death and their removal from Mother. Thus, Mother asserts that the current issues faced by the Children are all a result of their separation from Mother, which she claims is evidence of a strong bond between Mother and the Children.

To address Mother's argument in connection with subsection 2511(b), we rely on the trial court's discussion of the facts it gleaned from the testimony offered at the termination hearing. The court opinion sets forth information about each of the seven Children's situation, including their relationships with his or her foster parent, their mental health treatment, and whether, and to what extent, there exists a bond between that child and Mother. The trial court's lengthy opinion provides:

> Since Children entered DHS care in October 2017, Mother has not had any contact with Children. Mother's visitation with Children was suspended at the shelter care hearing. At the permanency review hearing in October 2018, the trial court ordered that visitation only occur at the recommendation of Children's therapist[(s)]. On January 19, 2018, the trial court found that Child 1, Child 2, Child 3, Child 4, Child 5, and Child 6 were victims of child abuse, as perpetrated by Mother, and that aggravated circumstances existed. On August 28, 2018, the trial court found that Child 7 was the child of a parent who has been found to be the perpetrator of child abuse and that aggravated circumstances

- 16 -

existed. The trial court found that no reasonable efforts were to be made to reunify Mother with Children. Child 1 and Child 6 are currently placed in a foster home together. Child 1 was previously diagnosed with adjustment disorder by his CCTC clinician, following the death of Sibling. Child 1's diagnosis [was] subsequently changed by a different trauma-focused therapist to PTSD. Child 1 has been able to establish a therapeutic rapport with his CCTC clinician and he is able to discuss his experiences regarding the death of Sibling and the separation from Children and Mother. Although Child 1 experienced a significant amount of adjustment issues when first placed, Child 1 and his foster parent now share a parent-child relationship. Child 1 is now respectful in the home and the foster parent has ensured that Child 1 is always properly cared for. Child 1 does share a bond with Mother, but CUA has never been able to observe Child 1 interact with Mother and Mother has been unable to parent Child 1 since her incarceration. The foster parent participates in caregiver sessions with Child 1 and has indicated that she is willing to continue to participate, as needed. Child 6 has also been diagnosed with PTSD related to the death of Sibling. Mother has participated in two caregiver sessions with Child 6 prior to her incarceration and one caregiver session on or about June 2019. During those caregiver sessions, Child 6's CCTC clinician indicated that there were concerns regarding inconsistencies regarding matters involving Sibling's death, which led the clinician to believe that Child 6 is under pressure to keep matters regarding Sibling's death a secret. Child 6's CCTC clinician has also indicated that Child 6 appears to struggle with opening up about his past experiences, regarding both Sibling's death and previous trauma from prior separations from Mother, due to the family's involvement with New York's Children and Youth Services. Since Child 6 has been in placement with his foster parent, the foster parent has regularly participated in caregiver sessions with Child 6. Child 6 also shares a parent-child bond with his foster parent and he is well bonded with the foster parent. Child 6 has an attachment to Mother, but they do not share a positive parent-child relationship. Mother has not parented Child [6] since her incarceration. Child 6 has indicated that he believes that his relationship with Mother was unhealthy. Child 1 and Child 6 share a strong, positive bond with each other. Child 1 and Child 6 would not suffer any irreparable harm if Mother's legal rights were terminated and it is in Child 1 and Child 6's best interest to be adopted. Child 2 and Child 4 are currently placed in a pre-adoptive foster home. Child 2 and Child 4 have been placed in this home since their removal from Mother in

October 2017. Both Child 2 and Child 4 received trauma-focused therapy, but have since been discharged. Child 2 and Child 4's foster parent participated in the caregiver sessions when they were enrolled in therapy. Child 2 and Child 4 have excelled in school since their placement and they have developed relationships with the foster parent's family. Child 2 and Child 4 would not suffer any irreparable harm if Mother's parental rights were terminated. Child 2 and Child 4 should be freed for adoption. Child 2 and Child 4 love Mother, but Mother has not parented either child since her incarceration. Any bond that Child 2 and Child 4 has with Mother is very attenuated. Child 3 is currently inpatient at Belmont Psychiatric Hospital. Child 3 has required multiple psychiatric hospitalizations throughout the life of the case and has extensive mental health concerns. Child 3 has struggled in multiple foster care placements, including placement with Child 1 and Child 6. Child 3 made false abuse allegations against his former foster parent, who is also the current foster placement of Child 1 and Child 6. Child 3 later recanted those allegations. Leading to Child 3's current hospitalization, Child 3 became increasingly aggressive towards one of his former foster parents, dysregulated [*sic*] behavior, and an attempt to jump out of a moving car. Child 3's CCTC clinician has focused on assisting Child 3 with stabilization. Child 3 has indicated that he experienced "upsetting memories while in New York," which referenced community violence, as well as violence in Philadelphia. Child 3 is currently prescribed medication to address ADHD and aggressive impulsive behaviors. Child 3 needs closure regarding the open dependency matters. Child 3 would not suffer any irreparable harm if Mother's parental rights were terminated and it is in Child 3's best interest to be freed for adoption. At the time of the termination trial on July 12, 2019, Child 3 was not ready to be discharged. Child 5 is currently placed in a treatment-level foster home with a kinship provider. Child 5 has previously struggled in numerous placements prior to this kinship placement and was previously hospitalized for psychiatric concerns. Child 5 has indicated that he does not want to leave this current placement and he shares a loving relationship with the kinship parent. Child 5 refers to the kinship parent as his "forever mom" and has stated "this is my new family now." Child 5 resides with another child and refers to the child as his brother. Child 5 refuses to address Mother []as his mother anymore. Child 5 has been receiving services at CCTC and had previously participated in both individual therapy and school support. When Child 5 first began treatment with CCTC in November 2017 at the age of four, Child

5 exhibited aggression towards others, suicidal ideation, self-injury, and the habit of bringing weapons into his bedroom. Child 5 was later diagnosed with PTSD. Child 5 has alluded to a "secret" regarding Sibling's death, and that if he shared the secret, "Mom [Mother]" would be upset. Since participating in therapy at CCTC, Child 5 no longer becomes angry or aggressive and no longer refers to the private information regarding Sibling's death as a "secret," but instead, Child 5 refers to the information as "what really happened." Child 5's kinship parent understands his behavioral health needs and has indicated that she is willing to continue to address those issues. Although Child 5 is interested in participating in sibling visits with his female siblings, Child 5 is not interest[ed] in participating in sibling visits with his male siblings. Child 5 did not provide a reason as to why he does not want to visit with his male siblings, although Child 5 has referenced a relationship between the "secret" and his male siblings. When Child 5 did participate in a sibling visit, Child 5 cried and wanted to return to the kinship parent. Child 5 would suffer no irreparable harm if Mother's parental rights were terminated and it is in his best interest to be freed for adoption. Child 7 is currently placed in a foster home and has several resources that are interested in providing permanency to Child 7, including the foster parent of Child 1 and Child 6. Child 7 was originally placed in the foster home with Child 1 and Child 6 but was later removed from the home due to an investigation of abuse allegations from Child 3 that were later recanted. Child 7 is bonded with her current foster parent and the foster parent's daughter. Child 1 and Child 6's foster home would be an appropriate placement for Child 7, if she were to be moved. Child 7 has never resided in Mother's care and Child 7 does not know Mother. Child 7 would suffer no irreparable harm if Mother's parental rights were terminated and it is in Child 7's best interest to be freed for adoption. Legal Counsel spoke with Child 1, a thirteen-year-old boy, and Child 6, a fifteen-year-old boy, at length regarding their wishes. Child 1 and Child 6 admit that they love Mother, but they indicated that they have shown frustration to the length of time that they have been in care. Child 1 and Child 6 indicated that if they were not able to return to Mother on July 12, 2019, the day of the termination trial, then they wanted to be adopted by their foster parent. Child 1 and Child 6 also indicated that they were not interested in permanent legal custody. Legal Counsel observed Child 2, an eight-year-old girl, and Child 4, a nine-year-old girl, in their current foster home. Legal Counsel observed that they were happy and loved their

foster parent and the adult daughter of their foster parent, who lived across the street from the foster home. Child 2 and Child 4 are thriving in the foster home where they participated in after-school activities and received high honors in school. When Legal Counsel spoke with Child 2 and Child 4 about Mother, they became very quiet and were reluctant to share any information. Child 2 and Child 4 indicated that they care about Mother but they are happy with their current placement. Child 2 and Child 4 made no mention to Legal Counsel about their desire to be adopted, but stated that they wanted to remain in the home permanently. Legal Counsel visited Child 3, a ten-year-old boy, during his hospitalization. Child 3 immediately spoke about his desire to be placed in a foster home and adoption. Child 3 stressed his desire to go to a permanent home. Child 3 indicated that he loves Mother, but he is frustrated about the long duration of the matter. Child 5, a six-year-old boy, stated to Legal Counsel that he wants to be adopted by his current foster family. When Legal Counsel attempted to talk about Mother, Child 5 became very irritated and would try to leave the room. Child 5 will not address Mother as his biological mother. Child 7 was eleven-months-old and nonverbal at the time of the termination trial on July 12, 2019. Legal Counsel observed that Child 7 was attached to the foster parent and the foster parent's daughter. Child 7's needs are being met in her current foster home and she appears happy. It has been established that if Mother were immediately released from incarceration, Mother would be unable to meet Child 1, Child 3, Child 5, and Child 6's mental health needs. Mother has been incarcerated since March 10, 2018, sixteen months at the time of the termination trial on July 12, 2019, as she awaits trial for first degree murder and endangering the welfare of children. Even if Mother were to be released from prison in the near future, CUA does not believe that Mother and Children could be immediately reunified. Children, with the exception of Child 7, required extensive trauma-based therapy following the death of Sibling. The DHS witnesses were credible. The trial court's termination of Mother's parental rights to Child[ren] under 23 Pa.C.S.[] §[]2511(b) was proper and there was no error of law or an abuse of discretion.

TCO at 26-30 (citations to N.T. omitted).

Again, we have reviewed the record and conclude that the trial court's findings and conclusions are supported by the evidence before the court. Thus, we determine that DHS has carried its burden regarding Section 2511(b), and Mother is not entitled to any relief.[3]

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/20

---

[3] Although Mother's stated issue in her brief mentions the goal change orders issued for each of the Children, her brief contains no argument related to those orders. Therefore, Mother has waived any argument concerning the order changing the Children's goals.